UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 7/11/18

SECURITIES AND EXCHANGE COMMISSION,

       Plaintiff,

 - against -

PERRY SANTILLO, CHRISTOPHER PARRIS,
PAUL ANTHONY LAROCCO, JOHN
PICCARRETO, THOMAS BRENNER, FIRST
NATIONLE SOLUTION, LLC, PERCIPIENCE
GLOBAL CORPORATION, and UNITED RL
CAPITAL SERVICES,

       Defendants.

18-cv-5491 (JGK)

MEMORANDUM OPINION
& ORDER

JOHN G. KOELTL, District Judge:

 The Securities and Exchange Commission (the "SEC") brings this action alleging that Perry Santillo, First Nationale Solution, LLC ("FNS"), Christopher Parris, Paul Anthony Larocco, John Piccarreto, Thomas Brenner, Percipience Global Corporation, and United RL Capital Services, collectively perpetrated a massive Ponzi scheme, in violation of Section 10(b) of the Securities Exchange Act of 1934, see 15 U.S.C. § 77j(b), Rule 10b-5 promulgated thereunder, see 17 C.F.R. § 240.10b-5, Section 17(a) of the Securities Act of 1933, see 15 U.S.C. § 77q(a), and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940, see 15 U.S.C. §§ 80b-6(1) & 80b-6(2). The SEC seeks $51.2 million in disgorgement.

 On June 19, 2018, the SEC filed this action simultaneously with an ex parte emergency application for an order to show

cause, a temporary restraining order, and a preliminary injunction. That same day, the Court issued a temporary restraining order, which, among other things, temporarily froze all of the defendants' assets and scheduled a show cause hearing for June 29, 2018.

On June 26, 2018, Santillo and FNS filed a joint opposition to the SEC's motion for a temporary restraining order and a preliminary injunction, opposing only the SEC's requested asset freeze as overbroad.[1] On June 27, 2018, Santillo and FNS entered into a stipulated order for a preliminary injunction and an asset freeze, with the understanding that Santillo could seek to modify the asset freeze provision at the show cause hearing.

The Court held a show cause hearing on June 29, 2018, at which the SEC and Santillo's counsel appeared. At the hearing, the parties agreed that the Court should modify the asset freeze to exclude any income earned by Santillo in the course of any new employment. Santillo also requested that the Court unfreeze funds to permit him to run two businesses he owns, which are unrelated to the alleged Ponzi scheme. Santillo also requested that the Court unfreeze additional funds to pay for personal expenses and legal fees. The SEC stated that it might be

---

[1] Santillo and FNS have appeared by the same counsel and have acted jointly in this litigation. Because the issues addressed in this Memorandum Opinion and Order apply most directly to Santillo individually, the Court refers to Santillo and FNS collectively as "Santillo."

2

amenable to unfreezing the funds necessary to run the businesses unrelated to the Ponzi scheme but objected to the unfreezing of any funds to pay for Santillo's personal or legal expenses. The Court ordered that the asset freeze would continue until July 13, 2018, with the modification excluding any income earned by Santillo in the course of any new employment. The Court also ordered the parties to file by July 6, 2018, further submissions with respect to any additional modifications of the asset freeze, which the parties did.

For the following reasons, Santillo's motion to modify the asset freeze order is **granted in part** and **denied in part**.[2]

I.

A district court may issue an asset freeze if the SEC demonstrates (1) a concern that the defendant will dissipate the assets within the defendant's control or will transfer the assets beyond the jurisdiction of the United States, and (2) a basis to infer that the defendant violated the securities laws. SEC v. Duclaud Gonzalez de Castilla, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001) (citing SEC v. Unifund SAL, 910 F.3d 1028, 1041 (2d Cir. 1990)).

---

[2] The parties agree that the Court should resolve Santillo's request to unfreeze additional funds based on paper submissions and without an evidentiary hearing.

3

The authority to issue a preliminary asset freeze is within the equitable power of the district court. SEC v. Stein, No. 07-cv-3125, 2009 WL 1181061, at *1 (S.D.N.Y. Apr. 30, 2009) (Lynch, J.). An asset freeze "facilitate[s] enforcement of any disgorgement remedy that might be ordered in the event a violation [of the securities laws] is established at trial." SEC v. FTC Capital Mkts., Inc., No. 09-cv-4755, 2010 WL 2652405, at *3 (S.D.N.Y. June 30, 2010) (quoting SEC v. Coates, No. 94-cv-5361, 1994 WL 455558, at *1 (S.D.N.Y. Aug. 23, 1994)). But a court considering whether to issue an asset freeze must also weigh "the disadvantages and possible deleterious effect of a freeze . . . against the considerations indicating the need for such relief." Id. (quoting SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1106 (2d Cir. 1972)).

## II.

Santillo does not challenge the Court's authority to issue an asset freeze order. The parties do not dispute that there is a concern that Santillo's assets will be dissipated or that the SEC has demonstrated a basis to infer that Santillo violated the securities laws, although Santillo does not concede that he actually violated the securities laws. Santillo only requests that the Court exercise its equitable discretion to unfreeze additional assets.

4

## A.

Santillo requests that the Court unfreeze the assets of two businesses he owns -- a rental building in Utica, New York, and a trucking business known as Boyle Trucking. The parties agree that neither business is alleged to be part of the Ponzi scheme. Santillo proposes to create a new bank account for each business in which he would deposit any assets or income from those businesses. Santillo represents that he will use the assets associated with the Utica building only to pay bills, expenses, and other ordinary and necessary costs associated with the Utica building and that he will use the assets associated with Boyle Trucking only to pay bills, expenses, and other ordinary and necessary costs associated with Boyle Trucking. Therefore, Santillo argues, the Utica building and Boyle Trucking could continue to operate as self-sustaining businesses during the pendency of this litigation.

The SEC and Santillo report that the SEC has indicated that it may agree to a "carve-out" to the asset freeze order to allow for the operation of the Utica building or that the Utica building could be placed into Chapter 7 bankruptcy. The SEC does not address the Boyle Trucking business at all in its submissions to the Court. Santillo reports that the SEC has indicated to him that "perhaps" it would agree to the unfreezing of Boyle Trucking's assets if Boyle Trucking could be preserved

as a viable business. The parties discussed a receivership for the Utica property but the SEC concluded that it would not be worth the expense.

A defendant may seek a modification of an asset freeze if the modification "is in the interest of the defrauded investors." SEC v. Grossman, 887 F. Supp. 649, 661 (S.D.N.Y. 1995); see Coates, 1994 WL 455558, at *1. Here, it is plain that maintaining the Utica property and Boyle Trucking as viable assets would be beneficial to all involved in this litigation. Should the SEC prevail, these assets could be subject to disgorgement to repay defrauded investors. Should Santillo prevail, he could draw on these assets as sources of legitimate income. It therefore would make sense to unfreeze the funds derived from the Utica building and Boyle Trucking, provided those funds could maintain the businesses as viable assets. See SEC v. Cope, No. 14-cv-7575, 2016 WL 7429445, at *7 (S.D.N.Y. Dec. 23, 2016) ("The Second Circuit has recognized that keeping assets frozen may, under certain circumstances, 'thwart the goal of compensating investors if the freeze were to cause such disruption of defendants' business affairs that they would be financially destroyed.'" (quoting Manor Nursing Ctrs., 458 F.2d at 1106)).

The question remains whether unfreezing the assets of these businesses to operate the businesses would succeed in keeping

6

the businesses afloat. The SEC does not appear to question that the funds derived from the Utica rentals would keep the Utica building viable. Santillo represents that Boyle Trucking has an annual fixed cost of $6,000 and generates between $12,000 and $15,000 annually, and thus unfreezing Boyle Trucking's assets would allow the company to turn a profit. The SEC does not take a position on whether unfreezing Boyle Trucking's assets would impact the viability of that business. The Court therefore accepts Santillo's representation that it would also be worthwhile to unfreeze Boyle Trucking's assets to permit it to continue to operate.

Importantly, Santillo does not request to unfreeze any assets gained through his alleged fraud. The assets at issue here are limited to those of the Utica building and Boyle Trucking, and there is no suggestion that the Utica building or Boyle Trucking were at all associated with the alleged Ponzi scheme. There is therefore no concern that Santillo could use fraudulently obtained funds to run these otherwise legitimate businesses.

Accordingly, the Court will modify the asset freeze order to unfreeze the assets of the Utica rental building and Boyle Trucking, provided that Santillo creates a separate bank account for each business and that the assets and income of each business are used solely to operate that business. Santillo may

not use funds from the Utica rental building or Boyle Trucking for personal or legal expenses.

**B.**

Santillo also requests that the Court unfreeze revenue derived in the future from commissions on legitimate sales by Advise and Life Group LLC High Point Insurance Solution, LLC ("High Point"), an insurance company Santillo owns, to pay for living expenses for Santillo, his wife, and their five young children. Santillo estimates that his family spends $12,535 each month in living expenses. Santillo represents that High Point generates about $100,000 each month in revenue in commissions from previous sales of insurance. He requests that the Court unfreeze all of the revenue derived from commissions on legitimate insurance sales by High Point made after the date of this Memorandum Opinion and Order because he argues that the funds are not tainted in any way. As a secondary position, if the Court is inclined to order that some of the revenue from High Point's future sales be retained to satisfy any future disgorgement penalty, Santillo requests that the Court unfreeze no less than $70,000 per month, leaving $30,000 per month for potential disgorgement. Santillo repeatedly notes that High Point is not named as a defendant in this action and that it us not referenced by name in the SEC's Complaint.

The SEC opposes the unfreezing of any revenue derived from High Point. The SEC argues that High Point's assets should remain frozen because there is evidence that Santillo comingled funds derived from his Ponzi scheme with High Point's funds and there is evidence that Santillo may have used High Point business cards in furtherance of the Ponzi scheme. In any event, the SEC argues that High Point's assets should remain frozen because the defendants do not have nearly sufficient assets to satisfy the $51.2 million the SEC seeks in disgorgement. Indeed, the SEC's current analysis of Santillo's bank accounts, which analysis the SEC describes as "preliminary and incomplete," reflects that Santillo has only $34,140.64 cash on hand, and Santillo represents that FNS has assets worth only $18 million. Thus, the SEC urges that any money derived from High Point should be reserved to pay any disgorgement penalty at the conclusion of this case.

Although the central purpose of an asset freeze is to preserve funds to satisfy a potential disgorgement order, courts routinely carve out modest sums from asset freeze orders when necessary to meet the defendant's reasonable living expenses. See, e.g., SEC v. Dowdell, 175 F. Supp. 2d 850, 855 (W.D. Va. 2001) (unfreezing $4,000 per month, $2,500 per month, and $1,700 per month for each defendant for living expenses).

In this case, a modest sum should be unfrozen to meet Santillo's living expenses. Santillo and his family do not have sufficient funds outside the asset freeze to satisfy their living expenses because all of Santillo's assets are currently subject to the freeze, although the parties agree that Santillo is not prevented from obtaining income from any new source. Cf. SEC v. Duclaud Gonzalez de Castilla, 170 F. Supp. 2d 427, 430 (S.D.N.Y. 2001) (denying request to unfreeze assets for personal expenses where the defendant "voluntarily waived a $15,000 per month salary from his law firm," which was not subject to the asset freeze order); Coates, 1994 WL 455558, at *2 (denying request to unfreeze assets for personal expenses where the defendant and his family received nearly $12,000 per month in net income from a receiver). Santillo cannot be expected to live and support his family with no money at all.

The question then arises how much should be unfrozen to meet Santillo's living expenses. Two considerations guide the Court's analysis on this point. First, the need to preserve assets here is extremely high given the strength of the SEC's case and the wide gap between the amount sought in disgorgement and the value of the assets within the Santillo's control. Second, the pool of assets from which Santillo requests to draw personal expenses is somewhat uncertain because Santillo defines

that pool as the future revenue streams from High Point rather than a static pool of assets.

In light of those considerations, Santillo's request of $100,000 per month is patently unreasonable. Santillo's secondary position of $70,000 per month is also unreasonable. See SEC v. Private Equity Mgmt. Grp., Inc., No. cv 09-2901, 2009 WL 2058247, at *3-4 (C.D. Cal. July 9, 2009) (denying a request to unfreeze $27,000 per month for living expenses because amount requested was "a tremendously high overhead . . . that by no stretch of the imagination [could] be considered reasonable"). Those sums greatly exceed Santillo's estimated living expenses of $12,535 per month. Even $12,535 per month for Santillo's living expenses is far too high in view of the significant potential disgorgement penalty in this case. The alleged expenses are undocumented, other than by Santillo's representation, and they include items such as karate lessons that cannot be characterized as necessary living expenses. Moreover, Santillo is already permitted to seek new sources of income to support his family. $5,000 per month from High Point's future revenue is therefore a reasonable allotment for Santillo's living expenses.

Given the lack of documentation for Santillo's living expenses and for the future stream of income to High Point, a further requirement of the living-expenses exception to the

asset freeze is necessary: Santillo may draw the lesser of 5% or $5,000 each month from High Point's monthly revenue to pay for living expenses. If that amount proves unworkable, Santillo may inform the Court, provide documentation, and make an application to unfreeze additional funds for living expenses.

### c.

Finally, Santillo requests that the Court unfreeze funds derived from future commissions received by High Point to pay for attorneys' fees and costs in this civil action, in any imminent criminal action, and in any related action. The SEC opposes this request in its entirety.

Courts apply two different standards in assessing whether to unfreeze funds to pay for attorneys' fees, depending on the nature of the case in which the fees will be expended. See FTC Capital Mkts., 2010 WL 2652405, at *6-7.

To unfreeze assets to pay for attorneys' fees in any civil action, including an SEC civil enforcement action, "the defendant must establish that the funds he seeks to release are untainted and that there are sufficient funds to satisfy any disgorgement remedy that might be ordered in the event a violation is established." Stein, 2009 WL 1181061, at *1. Hence, assets should remain frozen when the defendant has not demonstrated that there are sufficient frozen assets to pay disgorgement. See, e.g., SEC v. Lauer, 445 F. Supp. 2d 1362,

1369 (S.D. Fla. 2006) (collecting cases); SEC v. Current Fin. Servs., 62 F. Supp. 2d 66, 68 (D.D.C. 1999). "Under this standard, defendants have been barred from utilizing frozen assets to pay legal fees associated with representation in a civil action when it is not clear 'whether the frozen assets exceed the SEC's request for damages' or disgorgement." FTC Capital Mkts., 2010 WL 2652405, at *7 (quoting SEC v. Bremont, 954 F. Supp. 726, 733 (S.D.N.Y. 1997)); see also SEC v. Quinn, 997 F.2d 287, 289 (7th Cir. 1993) ("Just as a bank robber cannot use the loot to wage the best defense money can buy, so a swindler in securities markets cannot use the victims' assets to hire counsel who will help him retain the gleanings of crime." (citations omitted)).

Santillo has not shown that he is entitled to relief from the asset freeze to pay for legal expenses in this SEC civil enforcement action. While he argues that future commissions paid to High Point are not tainted in any way, for example by being intermingled with proceeds from the alleged Ponzi scheme, Santillo has not come close to demonstrating that sufficient funds have been frozen to satisfy a potential disgorgement obligation of $51.2 million. Santillo argues that if he does not have assets to pay his civil attorneys, he may have to seek a stay in this case. Santillo may make any appropriate motion.

When a defendant seeks to unfreeze assets to pay for attorneys' fees in a criminal action, the Sixth Amendment right to counsel of choice requires courts to be more permissive in unfreezing assets. See FTC Capital Mkts., 2010 WL 2652405, at *3, *7. A defendant may seek to unfreeze assets to pay for attorneys' fees in any criminal action if the defendant can establish that the assets are not traceable to fraud. Id.; see Coates, 1994 WL 455558, at *3; see also Luis v. United States, 136 S. Ct. 1083, 1088 (2016) (plurality opinion) ("[T]he pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment."); Id. at 1096 (Thomas, J., concurring in the judgment) ("I agree with the plurality that a pretrial freeze of untainted assets violates a criminal defendant's Sixth Amendment right to counsel of choice."). Funds are traceable to fraud when they are "the proceeds of fraud." FTC Capital Mkts., 2010 WL 2652405, at *7.

However, Santillo's request for attorneys' fees to pay for counsel in any criminal proceeding is premature. No criminal proceeding has been initiated against Santillo, and therefore he has no ripe Sixth Amendment right to counsel. That right "attaches only at the initiation of adversary criminal proceedings, and before proceedings are initiated a suspect in a criminal investigation has no constitutional right to the assistance of counsel." Davis v. United States, 512 U.S. 452,

14

457 (1994) (citation omitted); see United States v. Medunjanin, 752 F.3d 576, 589 (2d Cir. 2014) (concluding that the Sixth Amendment right to counsel attached only when an indictment was filed against the defendant). Unlike SEC v. FTC Capital Markets, Inc., for example, where the district court unfroze assets to pay for defense attorneys in a criminal case for which charging documents had been returned against the defendant and unsealed, see 2010 WL 2652405, at *2, *10, here there is no evidence that any adversarial criminal proceedings have been formally initiated against Santillo. Santillo's request to unfreeze assets to pay for criminal defense attorneys is therefore denied without prejudice to renewal if adversarial criminal proceedings are initiated against him.

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, any remaining arguments are either moot or without merit. For the reasons explained above, Santillo's motion to amend the asset freeze order is **granted in part** and **denied in part** as follows:

- Santillo is authorized to create a new bank account in which to deposit any assets, past or future, generated by the rental units in the Utica, New York, building, provided that the assets in that bank account are used only to pay

any bills, expenses, and other ordinary and necessary costs associated with the Utica building;

- Santillo is authorized to create a new bank account in which to deposit assets, past or future, generated by Boyle Trucking, provided that the assets in that bank account are used only to pay bills, expenses, and other ordinary and necessary costs associated with Boyle Trucking;

- Santillo is required to create a new bank account in which to deposit any revenue generated by commissions on insurance sales by High Point received after the date of this Memorandum Opinion and Order, and he is authorized to draw the lesser of 5% or $5,000 each month from High Point's monthly revenue to pay for living expenses;

- Santillo's assets will not be unfrozen to pay for attorneys' fees and costs in this or any other civil action; and

- Santillo may apply for modification of this asset freeze order in the event that any criminal proceeding has been initiated against him.

The current modified asset freeze order and the original asset freeze order are subject to future modification on the basis of good cause shown.

**SO ORDERED.**

Dated:   New York, New York
         July 11, 2018

_____
John G. Koeltl
United States District Judge